**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **MAGNUM TOWING & RECOVERY, LLC, et al.** | ) | Case No. 3:04CV7671 |
| | ) | |
| | ) | Judge James G. Carr |
| Plaintiffs, | ) | |
| | ) | **DEFENDANTS' MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT WITH** |
| | ) | **MEMORANDUM IN SUPPORT** |
| **CITY OF TOLEDO, et al.** | ) | |
| | ) | John T. Madigan, Director of Law |
| Defendants, | ) | (0023614) |
| | ) | J. James Bishop, Senior Attorney |
| | ) | (0016287) |
| | ) | Keith J. Winterhalter, Senior Attorney |
| | ) | (0037834) |
| | ) | City of Toledo Department of Law |
| | ) | One Government Center, Suite 1710 |
| | ) | Toledo, Ohio  43604-2209 |
| | ) | Telephone:  (419) 245-1020 |
| | ) | Fax:  (419) 245-1090 |
| | ) | Email:  keith.winterhalter@toledo.oh.gov |
| | ) | |

Defendants, City of Toledo, Officer Kathy Trautman, Captain Jeff Henessey, Kathy Trautman individually and Jeff Henessey individually, pursuant to Rule 56, move the Court for summary judgment against Plaintiffs on all of their claims against Defendants.  This motion is supported by the attached memorandum.

Respectfully submitted,

JOHN T. MADIGAN, DIRECTOR OF LAW

/s/  J. James Bishop
J. James Bishop, Senior Attorney

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

On May 9, 2006, the Court issued its Order regarding Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion to Dismiss.  The Court denied Plaintiffs' motion and granted Defendants' Motion to Dismiss in part.  The result of the Court's May 9th Order is that three of Plaintiffs' due-process claims remain:  Magnum's alleged suspension for its failure to meet all Code requirements for operation of its South Avenue site; Magnum's alleged removal from the towing rotation for its failure to pay a quarterly remittance fee; and Plaintiffs' due-process claim regarding the alleged retroactively applied changes to the City's towing regulations.  Id., at 11-15.  Furthermore, Plaintiffs' surviving state claims include:  wrongful prosecution (Count VII); abuse of process (Count VIII); intentional interference with business relations (Count IX); breach of contract (Count X); and intentional infliction of emotional distress (Count XI).  Construing the evidence most strongly in Plaintiffs' favor, there are no genuine issues of material fact on any of Plaintiffs' claims, and Defendants, therefore, are entitled to summary judgment on all of Plaintiffs' claims against them.

### II.   STATEMENT OF FACTS

Magnum Towing and Recovery LLC is a motor vehicle towing company located in the City of Toledo, Ohio.  The company is one of nine towing companies licensed for Toledo Police tows.  The Plaintiff in this case challenges City of Toledo ordinances and regulations concerning how and when a tow operator is awarded and maintains a license.  The Plaintiff also challenges the City of Toledo's ability to amend regulations as they relate to fees a tow operator is paid.

A January 26, 2007 decision of the Court of Appeals of Ohio, Sixth Appellate District, Case No. L-06-1087 affirmed a Lucas County Court of Common Pleas decision.  The original

decision suspended Magnum from the tow list based upon a substantial failure to secure the personal property of an owner of a vehicle.  The Court noted  that"…there is no relevant evidence in the record to establish that the fact finder lost its way or created a miscarriage of justice."  The appellant, Magnum's assignment of error was not well-taken.

III.    **ARGUMENT**

     A.    **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will hear the burden of proof at trial.  *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986).  The party seeking summary judgment bears the responsibility to delineate with specificity the basis upon which the motion is brought and to identify those portions of the record which demonstrate the absence of a genuine issue of material fact.  Id. at 2553.

Once the moving party has met its burden, the burden of production shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial.  To meet this burden, the non-moving party must produce more than a mere scintilla of evidence to support its claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56, 106 S.Ct. 2505 (1986).  A party opposing a properly supported motion for summary judgment may not rely solely on the allegations in its pleadings to demonstrate a genuine issue of material fact.  F.R.C.P. 56(e); *Anderson* at 248, 251.

While the Court cannot usurp the jury's role of assessing the credibility or weight of the evidence, the Court must assess the sufficiency of the evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1398 (1986).  If the Court determines that when the evidence is construed most strongly in the non-moving party's favor, that there is no genuine

issue of material fact and that a reasonable jury could not find for the non-moving party, then the moving party is entitled to judgment as a matter of law.  Id. at 587, 1356.

### B.  **Plaintiffs' Federal Claims**

#### 1.  **Magnum's suspension for Code violations**

In its May 9, 2006 Order, the Court stated:

> If Magnum's allegations that it received permission to operate out of the South Avenue lot before meeting all the Code's requirements is well founded, dismissal is not warranted.  The City cannot grant permission to operate without having met Code requirements and then later summarily bar its continued operation solely for failing to meet those requirements.  To do so without some additional and legally acceptable justification would arbitrarily deprive Magnum of its right to due process.

Order at 12.  Defendants, however, never waived the Special Use Permit conditions contained in Ordinance No. 504-02 for the South Avenue location.

One of the provisions of the August 21, 2002 Settlement Agreement and Release concerned Plaintiffs' South Avenue property.

> It is distinctly understood that the provision of this Release was conditioned upon the approval by Toledo City Council of a Special Use Permit (S.U.P.) with certain specified conditions, Attachment 1 hereto, for the new location of Plaintiff's towing business at 3400 South Avenue, Toledo, Ohio, which approval was forthcoming on July 16, 2002.  The provision of this Release was further conditioned on the waiver by the Toledo Board of Zoning Appeals of the paving and storm water detention requirements set forth among the S.U.P. conditions, which waiver with certain conditions, Attachment 2 hereto, was provided on July 15, 2002.

See Petrey dep., Exhibit A; copy attached hereto as Exhibit A.  The Special Use Permit for the South Avenue property was granted through Ordinance No. 504-02.  See Exhibit B.  However, before Plaintiffs could occupy the property, they were required to comply with all of the conditions listed in Section 2 of the Ordinance.  When the Plaintiffs meet the conditions of the Ordinance and all appropriate Building Code, Fire Prevention Code and Health Code provisions,

4

an Occupancy Permit would issue and Plaintiffs could then operate their business at the South

Avenue location.

Toledo Municipal Code Section 765.05 (e) (2) provides:

> The premises of a Class A licensee, any auxiliary site used by a Class A licensee and any
> other licensed storage facility used for storage shall when the same is located within the
> corporate limits of the City, conform to the applicable requirements of the Municipal Code
> including the Planning and Zoning Code, the Building Code, the Fire Prevention Code and
> the Health Code.

The only method of avoiding the requirements of the Toledo Municipal Code is through the

Toledo City Council enacting an ordinance.  See T.M.C. Sections 37 & 42.  In 2003, no

ordinance was enacted to allow Plaintiffs to operate out of the South Avenue location while they

were not in compliance with  the T.M.C.

At the time of Plaintiffs' suspension for noncompliance with the T.M.C., they were

operating out of the Wamba Street location.  An Occupancy Permit had not been issued for the

South Avenue property because Plaintiffs had not met all of the conditions of the Special Use

Permit or the T.M.C. for the property.  As a result, any business operation out of the South

Avenue location before an Occupancy Permit was issued would violate City law and be subject

to criminal prosecution.  See T.M.C. Section 1319.99.  Plaintiff did not notify City of its new

South Avenue location prior to using it as required by T.M.C. 765.  None of the individual

Defendants could authorize Plaintiffs' violation of the T.M.C. by allowing them to occupy and

operate the South Avenue property without securing an Occupancy Permit.

Because the City did not grant Plaintiffs permission to operate out of the South Avenue

location, Plaintiffs cannot sustain this due process claim.  As a result, Defendants are entitled to

summary judgment on this claim.

## 2. **Magnum's removal for failure to pay quarterly remittance**

The Court, in its May 9, 2006 Order, overruled Defendants motion to dismiss Plaintiffs'

due process claim based on Magnum's failure to pay the required quarterly fee.  Order at 14 &

19.  The Court stated:

> This claim nonetheless survives the City's motion to dismiss because
> Magnum alleges the City intentionally misplaced Magnum's check in
> retaliation for prior disagreements.  Such an act, if true, would violate
> substantive due process:  the City cannot arbitrarily decide whose
> payments to accept and intentionally misplace the checks of disfavored
> towers.  See *Wolff*, 418 U.S. at 558 (government violates due process if
> it enforces regulations in an arbitrary or discriminatory manner).
> Therefore, this claim survives only under the theory that the City
> intentionally misplaced Magnum's check, and Magnum will have to
> prove as much to succeed.

Id.  Plaintiffs, however, cannot establish that the City intentionally misplaced Magnum's check.

At her deposition, Anna Petrey was asked about this claim.

Q.    Okay, and correct me if I'm wrong, this document is indicating that as of 6-4-04
they--the City had not received your payment for the invoice that was Defendants'
Exhibit J; is that correct?

A.    That's what it states here, yes.

Q.    Okay.  Do you have reason to doubt that they--

A.    I paid all the bills within 30 days.

Q.    Okay.  Do you know whether or not they received payment on 6-4-04 of the
invoice that is Defendant's Exhibit J?

A.    I sent it by mail.  Now whether they got it, I don't know, but I mailed it.

Q.    Okay, so you don't know whether they were telling the truth here or not when
they said they hadn't received it?

A.    Right.

Q.    Okay.  In all possibility, they hadn't received it at that point in time?

A.    When I drop it in the mailbox, it's out of my hands.

6

Q.      So the answer to the question is, yes, that's possible?

A.      Right.

* * *

Q.      Okay.  I want to look at the first sentence.  It says this claim, nonetheless, survives the City's motion to dismiss because Magnum alleges the City intentionally misplaced Magnum's check in retaliation for prior disagreements?

A.      Yes.

* * *

Q.      Who intentionally misplaced the check?

A.      I have no idea.

Q.      Do you even know whether the check was intentionally misplaced?

A.      I don't know that either.

Q.      Do you know what happened to the check?

Q.      No, I don't.

* * *

Petrey dep. at 48-49, 100-02.  Thus, Ms. Petrey testified that she has no idea what happened to the check once she mailed it.  Plaintiffs, therefore, can provide no admissible evidence that the City intentionally misplaced Magnum's check.  As a result, Defendants are entitled to summary judgment against Plaintiffs on this claim.

### 3.  Retroactively applied changes to the City's towing regulations.

In its May 9, 2006 Order, the Court held that dismissal of Plaintiffs' claim that the City retroactively applied changes to its towing regulations was inappropriate because the parties had failed to brief the issue.  Order at 15.  A review of the circumstances and applicable law, however, indicate that Ordinance 829-03 merely corrected clerical errors in the fee structure and the split of auction proceeds as set forth in Ordinance 499-03.

7

On August 19, 2003, Toledo City Council passed Ordinance 499-03.  A copy is attached

as Exhibit C.  The Summary & Background of Ordinance 499-03 provided:

> Chapter 765 of the Toledo Municipal Code provides for the licensing of
> the truck operators called upon by the Toledo Police Department to tow
> vehicles from accident and crime scenes.  Tow operators are permitted
> to charge vehicle owners $70.00 per tow for a car and additional
> amounts for trucks depending on the size of the vehicle.  If a vehicle
> towed pursuant to a police ordered tow goes unclaimed by the owner,
> an auction of the vehicle can take place.  The proceeds from the sale of
> a vehicle are divided between the tow operator who receives his towing
> and storage costs plus 80% of the sale proceeds and the City of Toledo
> which receives 20% of the sale proceeds.
>
> This ordinance will increase police ordered towing fees by fifteen
> dollars for every vehicle towed.  The additional $10.00 will be remitted
> by the tow operators to the City of Toledo to cover administrative
> expenses.  This ordinance will also change the division of money
> recovered from the sale of vehicles that do not sell for more than the
> towing and storage costs.  The City of Toledo will receive 60% and the
> tow operators will receive 40%….

See Exhibit C.  Thus, a primary purpose of Ordinance 499-03 was to raise the amount tow

operators could charge vehicle owners from $70.00 to $85.00, and to change the distribution of

the proceeds from the auction of an unclaimed vehicle from 80% for the tow operator and 20%

for the City, to 60% for the City and 40% for the tow operator.  Id.

Ordinance 499-03, however, contained a number of typographical errors.  For example,

Section 765.12(a) stated that the charge for a passenger car "shall be eighty dollars ($85.00)".  In

addition, Section 765.25(b), which concerns the split of auction proceeds, stated that "eighty

percent (40%) shall be paid to the towing company performing the service, and twenty percent

(60%), less administrative and auctioneer expenses, shall be paid to the General Fund."  Id.

Despite these typographical errors, the increase of the towing charge to $85.00 under Section

765.12(a) and the change in the split of auction proceeds for the sale of unclaimed vehicles to

60% for the City and 40% for the tow operator, went into effect after the passage of the

ordinance in August, 2003.  <u>See</u> Affidavit of Jeffrey Hennessy, attached hereto.  Moreover, all of

the tow operators, including Magnum Towing, understood the changes and abided by them.  <u>Id</u>.

On November 25, 2003, the Toledo City Council passed Ordinance 829-03 to address the

errors contained in Ordinance 499-03.  The Summary & Background section of Ordinance 829-

03 provides:

> Ordinance No. 499-03 enacted on August 19, 2003 amended parts of
> Chapter 765 of the Municipal Code to permit an increase in fees that
> could be charged by motor vehicle towing companies licensed by the
> City of Toledo to perform police ordered tows.  This ordinance corrects
> certain clerical errors and items inadvertently omitted form Ordinance
> No. 499-03…

A copy of Ordinance 829-03 is attached as Exhibit D.  Thus, Ordinance 829-03 is a remedial law

whose purpose is to correct the errors in Ordinance 499-03.  As a result, it could be applied

retroactively.

R.C. 1.48 provides that a statute is presumed to be prospective in its operation unless

expressly made retrospective.  This constitutional restriction against retroactive application of

laws applies to ordinances.  <u>See</u> *Gibson v. Oberlin* (1960), 171 Ohio St. 1.  Thus, in the absence

of any evidence that an ordinance was intended to apply retroactively, it must be applied only

prospectively.  In *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision* (2001), 91

Ohio St.3d 308, the court established a two-prong test to determine unconstitutional retroactivity

as opposed to merely remedial, constitutional retroactivity.  First, a court must determine

whether the ordinance was expressly intended to apply retroactively.  If so, the court then

questions whether the statute is substantive, rendering it unconstitutionally retroactive.  <u>Id</u>.  A

claim of substantive retroactivity cannot be based solely upon evidence that a statute

retrospectively created a new right.  It also must include a showing of some impairment, burden,

deprivation, or new obligation accompanying that new right.  *Bielat v. Bielat*, 87 Ohio St.3d 350

(2000), paragraph two of the syllabus.

9

In the case at bar, Toledo City Council indicated that Ordinance 829-03 was to apply retroactively.  This ordinance was expressly enacted to correct clerical errors and omissions in Ordinance 499-03.  It did not change the towing fee structure or the split of auction proceeds as set forth in Ordinance 499-03.  Ordinance 829-03 created no new rights, and imposed no new burdens, duties, obligations, or liabilities as to a past transaction.  Ordinance 829-03 merely corrected clerical errors in the fee structure and in the split of auction proceeds.  As a result, Ordinance 829-03 is merely remedial and, therefore, it is constitutionally retroactive.

### C.      Plaintiffs' State Law Claims

Plaintiffs also have alleged five state law claims that were not addressed in the Defendants' motion to dismiss.  Plaintiffs, however, cannot meet their burden of proof on any of these claims.  As a result, Defendants are entitled to summary judgment on all of Plaintiffs' state law claims.

### 1. Plaintiffs' wrongful prosecution claim.

In Count VII of their First Amended Complaint, Plaintiffs allege that the Defendants "have had numerous frivolous criminal charges brought against employees and individuals associated with Plaintiffs' business".  Plaintiffs contend that this was done "in hopes of putting Plaintiffs out of business".  Plaintiffs label this claim wrongful prosecution, however, based on the allegations of Count VII, it appears that Plaintiffs are alleging a malicious prosecution cause of action.

To establish the tort of malicious prosecution, a plaintiff must prove the following elements:

1.      malice in instituting or continuing the prosecution;

2.      lack of probable cause; and

10

3.      termination of the prosecution in favor of the accused.

*Criss v. Springfield Twp*. (1990), 56 Ohio St.3d 82.  In the case at bar, Plaintiffs cannot establish that Defendants instituted or continued a prosecution.

At her deposition, Anna Petrey was asked who were the "employees and individuals associated with Plaintiffs' business."  Petrey dep. at 104.  She named only herself and her sons Kevin and Keith Trombley.[1]  Id.  Ms. Petrey also was asked to identify the numerous criminal charges" brought against Plaintiffs and Kevin and Keith Trombley.  With respect to the criminal charges against the Plaintiffs, Ms. Petrey stated:

Q.      *** What frivolous criminal charges have been brought against you and against Magnum?

A.      There was the taxes and there was the guitar and the leather coat.

Q.      Okay.  Anything else?

A.      I don't remember.

Q.      Okay.  Now, the taxes were actually two issues, right?

A.      Just sales tax, as far as I know.

Q.      So, you're not including the vendor's license in that?

A.      Oh, is that a separate one?

Q.      Yes.

A.      Oh, okay.

Q.      Okay.  Now we talked earlier and you told me that it was the State that brought those charges against you, is that correct?

A.      I guess.

                                        * * *

Q.      Okay.  Defendants didn't bring those charges against you or Magnum, did they?

---

[1] Neither Kevin Trombley nor Keith Trombley is a part to this lawsuit.  As a result, any claim that they might have for malicious prosecution is not before this Court.

* * *

A.    I will put it this way:  at every meeting that I had on those taxes, Trautman was there.

Q.    Okay, but that doesn't really answer the question so let me go back and re-ask it. Okay?

A.    Okay.

Q.    You'll have opportunity to say what you want.

A.    Did they personally bring the charges against me?

Q.    That's my first question.

A.    I would say no.

* * *

Q.    *** There was never a criminal charge brought against either you or Magnum about the coat, was there, and the guitar?

A.    We just went to the kangaroo court.

Q.    By kangaroo court, you're referring to the Towing Board of Review, right?

A.    Right.

Q.    So the only criminal charges had to do with the taxes and the vendor's license?

A.    Yes.

Q.    And both of those were brought by the State of Ohio, right?

A.    Yes.

* * *

Q.    *** Now, the allegation isn't that they brought them, it says at the instigation of Defendants.

A.    Yes, they instigated this.

* * *

Q.    So what did they do to instigate the criminal charges against you and Magnum?

A.    I don't know.

Petrey dep. at 103-07.  Ms. Petrey admitted at her deposition that it was the State that instituted the only criminal charges against her and Magnum and that she does not know what, if anything, Defendants did to instigate these criminal charges.

With respect to Kevin and Keith Trombley, Ms. Petrey testified as follows:

Q.    Were there frivolous criminal charges brought against either of your two sons?

A.    Well, they had Kevin arrested.  That was--that was for the bad check, I believe, I'm not sure, and Keith, he had an allegation--an altercation I should say, at school over his daughter, and he failed to appear in court and they jumped on that.

Q.    Okay.  Now, were those criminal charges brought against both of them?

A.    No, they didn't--they just supposed to appear in court and they didn't.

Q.    And a bench warrant was issued?

A.    Yes.

* * *

Q.    Okay, so you don't know what criminal charges were brought against your sons that were frivolous?

A.    Kevin's was for a bad check and Keith's was for an altercation at school.

Q.    And who brought those charges?

A.    I don't know.

Q.    Okay.  Do you know whether or not the City of Toledo brought those charges?

A.    No.

Q.    Do you know whether Kathy Trautman brought those charges?

A.    No.

Q.    Do you know whether Jeff Hennessy brought those charges?

A.    No.

Petrey dep. at 108-110.  Thus, Ms. Petrey has no evidence that Defendants instituted or continued any prosecution against her sons.  Moreover, the bench warrants that were issued against Kevin and Keith had been instituted by the court, not by Defendants.

13

Because there is no evidence that the Defendants instituted or continued any prosecution against Ms. Petrey, Magnum Towing, Kevin Trombley or Keith Trombley, Plaintiffs cannot sustain their malicious prosecution claim against Defendants.  As a result, Defendants are entitled to summary judgment on Count VII of Plaintiffs' First Amended Complaint.

## 2. **Plaintiffs' abuse of process claim.**

In Count VIII of their First Amended Complaint, Plaintiffs allege that the Defendants have used the Toledo Municipal Code, legal process and various regulatory bodies to put Plaintiffs out of business i.e., citations for illegal dumping and building and zoning issues.  In order to establish their abuse of process claim, Plaintiffs must satisfy three elements:  (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process.  *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294, 298 (1994).  In an abuse of process case, the improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club.  Prosser & Keeton on Torts (5 Ed. 1984) 898, Section 121.

Plaintiffs cannot sustain their abuse of process claim because they cannot establish that the Defendants set a legal proceeding in motion or that the Defendants attempted to accomplish an ulterior purpose for which the legal proceeding was not designed.  With respect to any criminal proceedings, Plaintiffs have no evidence that any of the Defendants set any criminal proceedings in motion against them.  See section III(C)(1) above.  Moreover, Ms. Petrey testified at deposition that Plaintiffs were not cited for any "illegal dumping" or building and zoning issues.  Petrey dep. at 125-127, 129.  Because no citations were issued, no legal proceeding was

14

set in motion.  Plaintiffs, therefore, cannot establish the first element of their abuse of process claim.

Additionally, Plaintiffs have no evidence that any legal proceedings in which they were involved were instituted to accomplish an ulterior purpose.  At her deposition, Ms. Petrey stated:

> Q.    Okay.  Do you think that the defendants used anything to harass and intimidate you and Magnum?
>
> A.    Well, they sent the City people out for the dumping, they sent three or four people out for the building inspections, and they were slow in granting permits and giving the final okays.
>
> Q.    Okay.  Now do you think Trautman and Hennessy were somehow involved in that happening?
>
> A.    Yes.
>
> Q.    Okay, and what facts--
>
> A.    My personal opinion.
>
> Q.    Just your opinion?  Okay.  Now do you think anyone else at the City was singling you personally out or Magnum personally out?
>
> A.    No.

Id. at 126.  It is clear that Plaintiffs rely only on personal beliefs and opinions to support their abuse of process claim.  This, however, is not sufficient to meet their Rule 56 burden of proof.  As a result, Defendants are entitled to summary judgment on Count VIII of Plaintiffs' Amended Complaint.

### 3.  Plaintiffs intentional interference with business relation's claim

In Count IX, Plaintiffs allege that the Defendants have interfered with Plaintiffs' business relations and business expectations to perform police tows, store towed vehicles and collect fees for their work.  A claim of tortuous interference with business relationships requires proof of the following elements:

> (1)    a business relationship;

15

(2)     known to the tortfeasor;

(3)     an act by the tortfeasor that adversely interferes with that relationship;

(4)     done without privilege; and

(5)     resulting in harm.

<u>See</u> *Brookside Ambulance, Inc. v. Walker Ambulance Serv.* (1996), 112 Ohio App.3d 150, 155-56.

In the case at bar, Plaintiffs are licensed by the City of Toledo to provide police tows on a rotation with the other licensed police towers.  The fees that Plaintiffs collect are paid by the owners of the vehicles that Plaintiffs have towed, or from the sale of unclaimed vehicles pursuant to the Toledo Municipal Code.  Thus, the business relationship is between Plaintiffs and the vehicle owners and other private entities for whom Plaintiffs provide towing services.  There is no evidence that any of the Defendants acted to adversely interfere with Plaintiffs' relationship with the vehicle owners that they have towed.

In their answers to Defendants' interrogatories, however, Plaintiffs contend that Defendants interfered with their business by "bad mouthing" Plaintiffs to other tow companies, repair shops and insurance representatives.  The issue of "bad mouthing" was addressed during Ms. Petrey's deposition.

A.     Well, because we towed for a lot of insurance companies, we towed for a lot of garages, and after you get a black marks on your record then nobody wants to do business with you so we lost -- we lost all the insurance company tows and we lost a lot of garage, private business tows.

Q.     Okay, and when you say a black mark on your record, what are you referring to?

A.     Hennessy and Throne are like this [indicating], okay, and they talk.

Q.     To whom?

A.     To each other.

Q.     Okay.

16

A.     And so Throne would talk to the insurance companies and he would talk to the other businesses and they just --

Q.     Okay, and how do you know that Throne would talk to the insurance companies?

A.     Word of mouth.

Q.     Did you ever witness him talking to the insurance companies?

A.     No.

Q.     Did you ever overhear him having a conversation with any insurance company?

A.     No.

* * *

Q.     ***Let's talk about damages that you have suffered.  Okay.  What---

A.     What damages have I suffered?

Q.     That's what I'm asking.

A.     A loss of business.  Okay.  A black eye.

Q.     Physically a black eye?

A.     No. No. No. No. No, if he tells her something bad about you, then she's not going to do business with you.

Q.     Uh-huh.

A.     Okay.  That was the same thing that happened with the insurance companies and with the garages.

Q.     Okay, but you don't know who said what to whom?

A.     No.

Petrey dep. at 120-22, 129.  Thus, Plaintiffs have no admissible evidence that Defendants acted to adversely interfere with their business relations.  In fact, it appears that Plaintiffs believe that Throne may have acted adversely to Plaintiffs, but there is no evidence that Defendants were doing the same.  Because Plaintiffs cannot establish that the Defendants acted to adversely

17

interfere with their business relations, Defendants are entitled to summary judgment on Count IX of Plaintiffs' First Amended Complaint.

### 4. <u>Plaintiffs' Breach of Contract Claim</u>

In Count X of their First Amended Complaint, Plaintiffs allege that Defendants breached the terms of the August 21, 2002 Settlement Agreement and Release ( "Agreement" ) by targeting Plaintiffs for unjust and unfair treatment.  To prove breach of contract, a plaintiff must demonstrate the following elements:  (1) that a contract existed; (2) that the plaintiff fulfilled his obligations; (3) that the defendant failed to fulfill his obligations; and (4) that damages resulted from this failure.  *Lawrence v. Lorain Cty. Community College* (1998), 127 Ohio App.3d 546.

At her deposition, Ms. Petrey was asked what provisions of the Settlement Agreement and Release that Defendants had breached.  Petrey dep. at 135.  She identified the last paragraph on page one of the Agreement, which states:

> It is acknowledged that plaintiffs are currently operating their business at 515 Wamba Street in Toledo, Ohio, but intend to relocate to the 3400 South Avenue address upon construction of a building there.  It is understood and agreed that provided such relocation occurs within the time periods prescribed by law for that construction, plaintiffs may continue to operate as a Class A Police Tower at 515 Wamba without regard to any need for a Special Use Permit at that location.  It is further understood and agreed that no retaliatory actions shall be taken against Magnum Towing by the City or its Police Department with regard to its Class A status as a result of the institution of the lawsuit at issue here or its resolution.

Petrey dep. at 136; Exhibit A.  Ms. Petrey testified that this provision was breached because the City told Magnum that it could operate out of South Avenue and after they moved there, the City told her she could not operate at the South Avenue location.

Because the Agreement's language only addresses the operation at Wamba, Ms. Petrey was asked to explain her contention.

Q.    Okay.  Now, that sounds to me as though you can operate at Wamba, it doesn't say anything about your operation at South?

18

A.      No, because the special use permit was waived on South.

                                    * * *

Q.      Who's they waived it?

A.      Who was it?  Was it Burkhardt?  I can't remember.

Q.      Well, was there some other agreement other than this settlement agreement that is Defendants' Exhibit A that talked about the South Avenue property?

A.      Not that I'm aware of.

                                    ***

Q.      Okay.  Is there anything else in the settlement agreement that was breached by defendants?

A.      They -- well, we got the trailer and then after we got the trailer, they said it was no good.  That was what Kevin went down -- They got Kevin on was -- was the occupancy permit --

Q.      Okay.

A.      ----and that.  After we got in it, they said everything was okay, then they sent some guys out and says no you can't be in here, and yet they're operating out of the same darn kind of trailer that we had.

Q.      Okay.  Where in the document does that language appear?

A.      It doesn't.

Q.      Okay, so, again, we're talking about a breach of this document, right?

A.      Yes.

Q.      Okay, and I need you to show me all of the provisions in this document that you believe that defendants have breached.  Now, you've shown me the one ---

A.      You can't do it on this one.

                                    ***

Q.      Okay, so is there some other one that's out there?

A.      Verbal.

Q.      Okay.  Between whom?

A.      Hennessy and Snyder and us, or me.

                                      19

Petrey dep. 135-37.  Plaintiffs have not presented evidence that the Settlement Agreement and Release was breached.  Instead, Ms. Petrey contends that there was a separate oral agreement between her and Hennessy and Snyder.  Plaintiffs have not alleged the breach of an oral contract concerning the South Avenue location in their Complaint against Defendants.

In their discovery responses, Plaintiffs contend that Defendants have engaged in numerous retaliatory actions as a result of the institution of the lawsuit or its resolution.  Plaintiffs, however, do not identify the alleged retaliatory actions or how any of Defendants' actions are retaliation for the lawsuit or its resolution.  Plaintiffs cannot rely solely on the allegations in their pleadings to demonstrate a genuine issue of material fact.  F.R.C.P. 56(e).  Plaintiffs must produce evidence of Defendants' retaliation and that the acts were undertaken because of the lawsuit or its resolution.  Plaintiffs have failed to meet their burden of proof and, therefore, their breach of contract claim must fail.

**5.  <u>Plaintiffs' intentional infliction of emotional distress claims</u>**

In Count XI of their First Amended Complaint, Plaintiffs allege that Plaintiff Anna Petrey has suffered emotional distress as a result of Defendants' extreme and outrageous conduct.  To establish a claim of intentional infliction of emotional distress, a plaintiff must show:

(1)    that the defendant intended to cause emotional distress, or knew or should have known his actions would result in serious emotional distress;

(2)    that the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community;

(3)    that the defendant's actions proximately caused psychic injury to the plaintiff; and

(4)    that the plaintiff suffered serious mental anguish of a nature that no reasonable man could be expected to endure.

*Burkes v. Stidham* (1995), 107 Ohio App.3d 363, 375.

Moreover, in *Yeager v. Local Union 20* ((1983), 6 Ohio St.3d 369, the Court stated:

> It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Id. at 374-75.   Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not create liability on a claim of intentional infliction of emotional distress.  Id.

Plaintiffs have not identified conduct that is beyond all possible bounds of decency.  At her deposition, Ms. Petrey testified about the extreme and outrageous conduct alleged in her intentional infliction of emotional distress claim.

Q.     Can you tell me what extreme and outrageous conduct is being referred to?

A.     The constant phone calls of threatening of being suspended or license revoked or things of this nature.

Q.     Okay.  Anything else?

A.     They tried to get me arrested for the City -- vendor's license, the taxes.

Q.     Who is they?

A.     I going -- well, I don't know.

Q.     Okay.  You don't know that Trautman did that?

A.     No.

Q.     You don't know that Hennessy did that?

A.     No.

Q.     In fact, you don't know that anybody at the City did that, do you?

A.      No.

Q.      Okay.  Anything else?

A.      No.

Petrey dep. at 139-40.  Ms. Petrey also identifies two instances when her sons turned themselves in because of bench warrants against them as outrageous conduct that caused her emotional distress.  Id. at 142-44.  Both of Ms. Petrey's sons are adults and neither one lives with her.

None of the conduct about which Ms. Petrey complains is sufficient to meet the standard set forth in *Yeager*, *supra*.  The actions of which Plaintiffs complain only amount to indignities, threats, annoyances, petty oppressions or other trivialities that do not create liability on an intentional infliction of emotional distress claim.  As a result, Plaintiffs cannot sustain their intentional infliction of emotional distress claim and Defendants, therefore, are entitled to summary judgment on Count XI of Plaintiffs' First Amended Complaint.

III.    **CONCLUSION**

For the reasons stated above, the Court should grant Defendants' motion for summary judgment and enter an order dismissing all of Plaintiffs' claims with prejudice.

Respectfully submitted,

JOHN T. MADIGAN, DIRECTOR OF LAW

/s/  J. James Bishop
J. James Bishop, Senior Attorney

## CERTIFICATE OF SERVICE

This is to certify that this Motion was filed through the Court's electronic filing system and a copy has been mailed by ordinary U. S. mail to counsel for plaintiff, Timothy A. Magee, Esq., 347 N. Main St., Suite 3, Bowling Green, OH  43402, and co-counsel for plaintiff, Michael McGovern, Esq., 3021 Tazewell Pike, Knoxville, TN 37918 this 18th  day of June, 2007

/s/  J. James Bishop
J. James Bishop, Senior Attorney

KJW/db/Magnum-MFS
6/1/07