IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Magnum Towing & Recovery, *et al.*

Plaintiffs,

v.

City of Toledo, *et al.*,

Defendants.

Case No. 3:04CV7671

ORDER

Magnum Towing and Recovery (Magnum) and Anna Petrey, Magnum's owner, bring this 42 U.S.C. § 1983 suit against the City of Toledo, Ohio, and two Toledo police officers in their official and personal capacities. Magnum, a tower licensed to perform police-ordered tows of inoperable or abandoned cars within the city limits of Toledo, alleges that its due process rights were violated when the City suspended it from the list of towers eligible to perform tows, and, in a separate incident, revoked Magnum's towing permit. Magnum also claims that the City applied a particular towing ordinance retroactively in violation of the Ohio and federal Constitutions. Finally, Magnum brings several state claims based on harassment Magnum allegedly suffered at the hands of defendants.

Jurisdiction exists under 28 U.S.C. § 1331.

Pending are: 1) Defendants' motion for summary judgment; and 2) Defendants' motion to strike certain documents Magnum has filed in support of its opposition to defendants' summary judgment motion. For the following reasons, Defendants' motion for summary judgment shall be granted, and Defendants' motion to strike shall be denied as moot.

**Background**

Chapter 765 of the Toledo Municipal Code regulates towing within the city limits of Toledo. I discuss certain of these rules below. Magnum is a towing company located on South Avenue in Toledo. Magnum possesses a "Class A safety permit,"[1] allowing Magnum to perform private, third-party, and police-ordered tows within Toledo's city limits. T.M.C. § 765.02(a)(1).

A Class A permittee must meet several requirements to obtain a Class A permit, including, *inter alia,* maintaining a valid special use permit for the permittee's primary premises. T.M.C. § 765.03(b)(6). After the Director of Finance issues a tower a Class A permit, the Toledo Police Department enters the tower's name on a "police tow list," thereby assigning each permittee to one of three Toledo "towing districts." T.M.C. § 765.04(d). "Police calls within any given district shall be rotated among the towers assigned to that district." T.M.C. § 765.04(d).

If the Director of Public Safety learns that a permittee has violated any provision of Chapter 765 or any public safety regulation, the Director may impose: 1) a verbal warning; 2) a written warning; 3) suspension from the police tow list; 4) suspension of license; or 5) revocation of permit. T.M.C. § 765.23(b).

If a permittee desires to appeal a suspension or revocation, the permittee must deliver a written appeal to the Towing Review Board within seven calendar days from the day the permittee receives notification of that order. T.M.C. § 765.23(e). The Board must decide the appeal within thirty days. T.M.C. §765.24(a).

[1] The Toledo Municipal Code interchangeably refers to Class A "permits" and "licenses," *see, e.g.*, T.M.C. § 765.23(b), and to recipients of Class A "permits" and "licenses" as Class A "permittees" and "licensees," respectively, *see, e.g.*, T.M.C. § 765.07(c).

If the permittee appeals the Director's action, the suspension or revocation "shall be held in abeyance pending decision on the case by the Towing Board of Review." T.M.C. § 765.24(c).

At various times from 2003 to 2005, the Toledo City Council approved changes to sections of the Toledo Municipal Code regulating police-ordered tows. In one amendment, Council changed the relative percentages of the auction proceeds split between the City and a tower following auction of an abandoned vehicle.

Previously, the tower received 80% of the auction proceeds (to cover the cost of storage and towing), while the City received 20%. Pursuant to the amendment, the City received 60% of the proceeds and the towers received 40%.

**A. 1998 Lawsuit**

The parties have a somewhat turbulent history. In 1998, Petrey sued the City after it withdrew its initial approval of Petrey's application for a Class A permit. In her 1998 lawsuit, Petrey claimed that federal law preempted local towing regulations. I agreed and granted summary judgment for Magnum. *Petrey v. City of Toledo*, 2000 WL 246446 (N.D. Ohio). City officials subsequently added Magnum to the police tow list.

The City appealed my summary judgment decision, and the Sixth Circuit affirmed in part and reversed in part. *Petrey v. Toledo*, 246 F.3d 548 (2001). The case was remanded, and in August, 2002, the parties entered into a settlement agreement.

When Petrey filed her original suit against the City, her operation was on Wamba Street in Toledo. At the time of the settlement negotiations, she was in the process of relocating to her present South Avenue location. Petrey planned to move to South Avenue following construction of a building on that property.

As part of the settlement, Petrey released her claims against the City in consideration of approximately $10,000, and the Toledo City Council granted Petrey a special use permit, whereby Magnum could continue performing tows from its new South Avenue location. I dis missed the case with prejudice on October 10, 2002.

**B. July 2003 Suspension From the Police Towing List**

Discord between the parties continued after they signed the settlement agreement. On July 14, 2003, Magnum was removed from the police tow list because, according to the Police Department, the new South Avenue building, still under construction, did not conform to the specifications in T.M.C. § 765.05(e)(2). That section, entitled "Storage facilities," provides:

> The premises of a Class A licensee, any auxiliary site used by a Class A licensee and other licensed storage facility used for storage shall, when the same are located within the corporate limits of the City, conform to the applicable requirements of the Municipal Code including the Planning and Zoning Code, the Building Code, the Fire Prevention Code and the Health Code.

The notice of suspension issued by the Police Department provided that Magnum would be returned to the tow list after it complied with this Code provision. [Case No. 03:98CV7188, Doc. 79, Exh. 2].

Magnum appealed the tow list suspension in writing that same day (July 14, 2003), contending that it had carefully followed the Police Department's instructions relating to the construction of the new South Avenue facility. Magnum also requested that it remain on the tow list pending its appeal. [Case No. 03:98CV7188, Doc 79, Exh. 3].

In response, defendants informed Magnum that its tow list suspension was non-appealable**.** Magnum disagreed, arguing that, pursuant to T.M.C. § 765.23(3)(e), Magnum had the right to appeal

and the right to remain on the tow list pending the outcome of the appeal. [Case No. 03:98CV7188, Doc. 79, Exh. 4].

On July 23, 2003, Magnum filed a motion for a temporary restraining order, seeking to be reinstated to the tow list pending its appeal. Magnum withdrew this motion on August 6, 2003, after the City returned Magnum to the tow list. In a letter dated August 18, 2003, Magnum requested that the City schedule a date for Magnum's appeal before the Towing Review Board. [Case No. 03:98CV7188, Doc. 79, Exh. 6].

**C. June 2004 Revocation of Permit**

On June 4, 2004, the City revoked Magnum's towing permit and removed Magnum from the tow list, claiming that Magnum failed to make a necessary payment to the City pursuant to T.M.C. § 765.12(h). [Doc. 71, Exh. K]. Under that section, a permittee on a quarterly basis must remit $10 to the City for each vehicle towed, regardless of whether the permittee receives payment from the vehicle's owner. T.M.C. § 765.12(h). If the permittee fails to make such payment within thirty days of the invoice date, the permittee's permit may be revoked. *Id.*

According to the City, Magnum failed to make a necessary payment of $2410 due May 29, 2004, for 241 vehicles Magnum towed between January 2004 and March 2004. [Doc. 71, Exh. J, Exh. K].

Magnum appealed the City's decision that same day (June 4, 2004), claiming that Magnum mailed a payment of $2410 to the City on May 27, 2004. [Doc. 71, Exh. L]. Magnum also requested to be returned to the tow list pending its appeal. [Doc. 71, Exh. L].

Magnum again requested on June 7, 2004, to be returned to the tow list. The City subsequently informed Magnum that if Magnum submitted a replacement check to the City, Magnum

would be returned to the tow list pending the appeal. On June 11, 2004, Magnum hand-delivered a replacement check to the City, renewed its appeal, and repeated its request to be returned to the tow list pending appeal. [Doc. 71, Exh. M, Exh. N].

On June 16, 2004, Magnum filed a motion for a temporary restraining order with this Court, seeking to be reinstated to the police tow list pending its appeal. I overruled this motion on June 17, 2004, as I had not retained continuing jurisdiction over the prior case which had led to the original settlement.

The Towing Board of Review reviewed Magnum's appeal of the revocation of its permit. On July 9, 2004, the Board concluded that the Police Department properly revoked Magnum's Class A permit because Magnum failed to remit timely payment to the City. Because Magnum had submitted a replacement check, the Board ordered that Magnum's permit be reinstated on July 7, 2004. The Board also ordered that the Police Department return Magnum to the police tow list on that date.

**D. Allegations of Harassment**

On October 25, 2004, Magnum moved this Court to enforce the settlement agreement. Magnum accused the City of singling out and harassing Magnum in numerous contexts: 1) the City requested that Magnum comply with requirements that other tow companies have ignored (including a "lengthy special-use permit process") [Case No. 03:98CV7188, Doc. 78, at 2]; 2) the Police Department removed Magnum from the tow list on July 14, 2003; 3) the City revoked Magnum's permit in June, 2004; 4) defendants sold Magnum tree mulch and subsequently threatened to cite Magnum for illegal dumping; 5) defendants arrested and charged Kevin Trombley, Petrey's son, regarding an insufficient funds check Magnum had issued to a contractor; 6) the City "selectively

prosecuted" Anna Petrey for sales tax violations;[2] and 7) the Towing Review Board issued Magnum a citation for failing to safeguard a recovered stolen vehicle.

I denied Magnum's motion because this Court had nto retained jurisdiction to enforce the parties' settlement agreement. [Case No. 03:98CV7188, Doc. 83, at 1-3]. Thus, Magnum had to file a separate action to enforce the agreement.

## Discussion

### A. Motion to Strike

In support of its opposition to defendants' summary judgment motion, Magnum filed three exhibits, two of which – Exhibits B and C – are at issue here.

Moving to strike 1) eighteen of the twenty pages attached to Exhibit B, the affidavit of Timothy A. Magee,[3] and 2) Exhibit C, defendants contend that these documents are unauthenticated and constitute inadmissible hearsay.

Defendants are correct that these documents were originally unaccompanied by an authenticating affidavit. Because, however, I have not considered either Exhibit B (and attached documents) or Exhibit C in reaching my decision on defendants' summary judgment motion, defendants' motion to strike shall be denied as moot.

---

2

As I discuss below, the State of Ohio, not the City of Toledo, brought these tax charges against Petrey.

3

Rule 56(e) states, in part, that sworn or certified copies of all documents referred to in an affidavit must be attached to the affidavit. This court has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded. *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (citations omitted).

Defendants do not – either directly or indirectly – seek to strike any portion of Magee's affidavit itself. I need not examine the affidavit to determine whether any portion should, in fact, be striken, as it is defendants' burden to identify objectionable paragraphs. *Lewis v. Horace Mann Ins. Co.*, 410 F. Supp. 2d 640, 647 (N.D. Ohio 2005) (citing *Ulmer v. Dana Corp.*, 200 F. Supp. 2d 804, 812 (N.D. Ohio 2002) (finding that a moving party may not make generalized allegations and leave the court to divine precisely which statements in which affidavits are objectionable)).

**B. Motion for Summary Judgment**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the party moving for summary judgment, defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Magnum's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In considering defendants' motion for summary judgment, I must accept Magnum's evidence as true and draw all reasonable inferences in Magnum's favor. *Id.* If, as the nonmoving party, however, Magnum fails to make a sufficient showing on an essential element of the case with respect to which it has the burden, defendants are entitled to summary judgment as a matter of law. *Celotex*, 477 U.S. at 322-23.

**1. Section 1983 Claims**

To establish liability under § 1983, Magnum must demonstrate that: 1) it suffered a deprivation of a right secured by the Constitution or laws of the United States; and 2) it was subjected or caused to be subjected to this deprivation by a person acting under color of state law. *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000) (citation omitted).

Magnum brings its 42 U.S.C. § 1983 claims against the City, a "person" subject to liability under the Civil Rights Act of 1871, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978), and two Toledo police officers in their official and personal capacities.

In *Kentucky v. Graham*, 473 U.S. 159 (1984), the Supreme Court distinguished between suits against individuals in their personal and official capacities and described what elements a plaintiff must establish to prevail in a § 1983 action:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.
>
> On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a " 'moving force' " behind the deprivation; thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.

*Id. at* 165-66 (internal citations omitted).

Thus, for those § 1983 claims Magnum has asserted against the City of Toledo and/or against Toledo Police officers in their official capacities, Magnum must establish that the alleged constitutional tort resulted from implementation of a policy or custom of the City. This requirement ensures that the City is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the City. *See Monell*, 436 U.S. at 694.

Magnum has not satisfied this requirement. In asserting the City violated § 1983 by depriving Magnum of its due process rights, Magnum failed to allege that official policy was the "moving force of the constitutional violation." *Id.*

Magnum does not identify "a deliberate choice to follow a course of action . . . made from among various alternatives by the . . . officials responsible for establishing final policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (citation omitted). Rather, Magnum argues that the treatment it suffered was an aberration, and that defendants singled it out for harassment: "Defendants [had a] malicious intent to harm Magnum, and effectively put Magnum out of business." [Doc. 74, at 7].

Thus, because Magnum fails to allege or prove that a custom or policy of the City caused it to suffer a constitutional deprivation, Magnum's § 1983 claims against both the City of Toledo and the police officers in their official capacities must fail.

**2. Due Process Claims**

The Fourteenth Amendment provides, in part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process is a flexible concept that generally requires some type of hearing prior to a state's deprivation of an individual's liberty or property. *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991) (citations omitted). Only after a plaintiff demonstrates that he or she possessed a protected property or liberty interest and was deprived of that interest will the court consider whether the plaintiff's due process rights were violated. *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002).

Magnum alleges that defendants' conduct repeatedly deprived it of its due process rights under the Ohio and federal constitutions. First, according to Magnum, defendants suspended Magnum from the police tow list in 2003 and revoked Magnum's Class A permit in 2004 and, in each case, 1) claimed that the penalty imposed was non-appealable, and 2) refused to stay enforcement pending

Magnum's appeal. Both of these rights, Magnum claims, are guaranteed to towers by the Toledo Municipal Code.

Second, Magnum alleges that defendants deprived Magnum of due process by suspending Magnum from the police tow list after giving Magnum permission to operate in violation of certain Toledo Municipal Code provisions.

Magnum contends that its constitutional rights were violated not as a result of an "established state procedure," but pursuant to a "random and unauthorized" act by vindictive City officials. *See, e.g., Mitchell v. Fankhauser*, 375 F.3d 477, 481 (6th Cir. 2004) (citations omitted). As a result, pursuant to the "*Parratt* doctrine," Magnum must establish that state court remedies are inadequate to remedy the constitutional tort it has suffered. *See id.* at 483.

Thus, even if I assume that Magnum has a property interest in both its tow license and its presence on the police towing list,[4] Magnum's procedural due process claims fail because Magnum failed to plead and prove that state remedies were inadequate to correct the alleged deprivation of Magnum's property interest. *See, e.g., Pappas v. Nash*, 2006 WL 2813681, at * 5 (N.D. Ohio) (dismissing § 1983 claim where plaintiff failed to plead and prove that state regulatory or common law remedies were inadequate).

**3. Proceeds from Auctioned Vehicles**

Magnum next alleges that defendants applied an ordinance retroactively in violation of the Ohio and federal Constitutions.

---

4

A license can be a property interest protected by due process, see, e.g., *Mackey v. Montrym*, 443 U.S. 1, 12-13 (1979), including a license to operate a business. *See* 16C Corpus Juris Secundum Constitutional Law § 1520 (citing *Goldrush II v. City of Marietta*, 482 S.E. 2d 347, 358 (Ga. 1997)). Possessing a business license does not, however, always automatically give the license holder a property interest. *See Quetgles v. City of Columbus*, 491 S.E. 2d 778, 781 (1997); *Benitez v. Rasmussen*, 626 N.W. 2d 209, 217-18 (2001) (no property interest in license to operate child-care business).

On August 19, 2003, the Toledo City Council passed Ordinance 499-03, which changed the relative percentages of the auction proceeds split between the City and a tower following the auction of an abandoned vehicle. Previously, a tower received 80% of the auction proceeds (to cover the cost of storage and towing), while the City received 20%. After November 25, 2003, the City received 60% of the proceeds and the towers received 40%.

The "Summary & Background" section of Ordinance 499-03 provides:

> Chapter 765 of the Toledo Municipal Code provides for the licensing of the truck operators called upon by the Toledo Police Department to tow vehicles from accident and crime scenes. Tow operators are permitted to charge vehicle owners $70.00 per tow for a car and additional amounts for trucks depending on the size of the vehicle. If a vehicle towed pursuant to a police ordered tow goes unclaimed by the owner, an auction of the vehicle can take place. The proceeds from the sale of a vehicle are divided between the tow operator who receives his towing and storage costs plus 80% of the sale proceeds and the City of Toledo which receives 20% of the sale proceeds.
>
> This ordinance will increase police ordered towing fees by fifteen dollars for every vehicle towed. The additional $10.00 will be remitted by the tow operators to the City of Toledo to cover administrative expenses. This ordinance will also charge [sic] the division of money recovered from the sale of vehicles that do not sell for more than the towing and storage costs. The City of Toledo will receive 60% and the tow operators will receive 40%. This will more closely reflect the expenses incurred by each party while allowing the tow operators to recover their towing and storage costs.

Ordinance 499-03, however, contained a number of typographical errors. For example, § 765.12(a) stated that the charge for a passenger car "shall be eighty dollars ($85.00)". In addition, § 765.25(b), which concerns the split of auction proceeds, stated that "eighty percent (40%) shall be paid to the towing company performing the service, and twenty percent (60%), less administrative and auctioneer expenses, shall be paid to the General Fund."

On November 25, 2003, Toledo City Council passed Ordinance 829-03 to "correct[] certain clerical errors and items inadvertently omitted form Ordinance No. 499-03." The "Summary & Background" section of Ordinance 829-03 provides:

> Ordinance No. 499-03 enacted on August 19, 2003 amended parts of Chapter 765 of the Municipal Code to permit an increase in fees that could be charged by motor vehicle towing companies licensed by the City of Toledo to perform police ordered tows. This ordinance corrects certain clerical errors and items inadvertently omitted form Ordinance No. 499-03.

Magnum contends that the City attempted to change the revenue-sharing formula in Ordinance 499-03, but this ordinance failed to implement this change. Thus, Magnum argues, by applying the new 80/20 revenue-sharing plan, which became effective in December 2003, to October 2003 auction proceeds, the City applied Ordinance 829-03 retroactively and unconstitutionally.

Defendants argue that Ordinance 829-03 merely corrected clerical errors in the fee structure and the split of auction proceeds as set forth in Ordinance 499-03. Because Ordinance 829-03 is a remedial law whose purpose is to correct the errors in Ordinance 499-03, defendants contend, it may be applied retroactively and lawfully.

Both parties assume that a mistake in the first ordinance rendered that ordinance obsolete. In other words, defendants and Magnum assume that the first statute, replete with errors, failed to implement the new 80/20 revenue-sharing plan. The parties only disagree about the lawfulness of the retroactive application of Ordinance 829-03: defendants argue that the ordinance was properly applied retroactively, while Magnum alleges that this retroactive application was unconstitutional.

Because Ordinance 829-03 does not expressly indicate that it should be given retroactive effect, I must assume that this ordinance is prospective in its application. *See* O.R.C. § 1.48; *Bielat v. Bielat*, 87 Ohio St. 3d 350, 353 (2000). If, despite the several errors that render Ordinance 829-03 "senseless," *Wickens v. Dunn*, 71 Ohio App. 177, 181 (1942), the Ordinance is read literally, it is clear that the Toledo City Council intended to change the revenue-sharing formula from a 60/40 split to a 80/20 split. It is clear that the drafter, after changing the numbers in the text

from "sixty" to "eighty" and from "forty" to "twenty," merely neglected to change the corresponding parenthetical.

I may regard these defects as the result of error or mistake and construe the statute in a way that "correct[s] the error or mistake by permitting the clear purpose and manifest intention of the Legislature to be carried out." *Id.*

Thus, by applying the 80/20 revenue split to October 2003 auction proceeds, the City correctly applied the terms of the first ordinance; the City did not retroactively apply the terms of the second ordinance. The City's application of the first ordinance is consistent with the clear and manifest intention of the City Council. Thus, because no statute was applied retroactively or unconstitutionally, Magnum's claim must fail.

**4. State Claims**

**a. Malicious Criminal Prosecution**

Magnum claims the City engaged in malicious criminal prosecution when the it allegedly brought frivolous criminal charges against Magnum, Petrey, and her two sons, Kevin and Keith Trombley. The City denies that it initiated any of the "prosecutions" Magnum attributes to defendants.

To establish a claim for malicious criminal prosecution, a plaintiff must demonstrate that: 1) the defendant maliciously instituted or continued a criminal prosecution against the plaintiff; 2) there was a lack of probable cause for the institution or continuation of the criminal prosecution; and 3) the criminal prosecution terminated in favor of the plaintiff. *Trussell v. General Motors Corp.*, 53 Ohio St. 3d 142, 146 (1990); *Criss v. Springfield Township*, 56 Ohio St. 3d 82, 84 (1990).

Magnum points to no evidence that the City instituted any criminal prosecution against it, Petrey, or her two sons. The State of Ohio – not the City – brought charges against Petrey for filing an improper tax return and operating without a required vendor's license.

Moreover, while the City did, in fact, suspend Magnum from the police tow list for failing to secure property stored in a recovered vehicle, no related criminal charge was ever filed against Magnum. Finally, in two separate cases, bench warrants were issued for the arrest of Petrey's two sons, but Petrey acknowledged that she did not know who brought the original charges against them. Petrey Dep. 103-07.

Thus, because Magnum points to no evidence suggesting that the City initiated criminal charges against Magnum, the City is entitled to summary judgement on Magnum's malicious criminal prosecution claim. *See Nahra v. Coliseum*, 1993 WL 261582, at *3 (Ohio App.) (granting summary judgment in part because plaintiff provided no evidence that defendant played any role in instituting criminal charges against him).

**b. Abuse of Process**

Magnum contends that defendants have used the Toledo Municipal Code, the legal process, and various regulatory bodies to try to put Magnum out of business. To establish a claim for abuse of process, Magnum must show that: 1) a legal proceeding has been set in motion in proper form and with probable cause; 2) the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and 3) direct damage has resulted from the wrongful use of process. *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294, 298 (1994). An improper ulterior purpose "usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money,

by the use of the process as a threat or a club." *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St. 3d 264, 271 (1996) (quotation omitted).

In contrast to claims of malicious criminal or civil prosecution, which require a lack of probable cause, the abuse of process claim was developed for "cases in which legal procedure has been set in motion in proper form." *Id*. at 297.

Magnum argues that the City, in an attempt to "get" it, improperly removed it from the police tow list on July 14, 2003. The City later reinstated Magnum to the tow list, Magnum contends, because the City could not identify any Toledo Municipal Code violations Magnum had committed. Thus, according to Magnum, the City could not develop a suitable pretext for the City's initial decision to remove Magnum from the tow list. Thus, if the City removed Magnum from the towing list improperly and without cause, as Magnum alleges, Magnum' abuse of process claim must fail because it requires that a legal proceeding be set in motion in proper form.

Even if Magnum alleged that the City properly removed Magnum from the police tow list, Magnum points to no evidence suggesting the City used a legal civil proceeding as a "threat or club." For these reasons, the City is entitled to summary judgment on Magnum's abuse of process claim.

**c. Intentional Interference with Business Relations**

Magnum alleges that defendants have interfered with Magnum's business relationships and have frustrated Magnum's business expectations to perform police tows, store towed vehicles, and collect fees.

Interference with business relations occurs when an individual, "without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A&B-Abell Elevatro Co. V. Columbus/Cent.*

*Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995). To establish a claim of intentional interference with business relations, Magnum must set forth: 1) the existence of a business relationship; 2) the wrongdoer's knowledge of the relationship or contract; 3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; 4) a lack of privilege; and 5) resulting damages. *Brookside Ambulance v. Walker Ambulance Service*, 112 Ohio App.3d 150, 155-56 (1996).

Because Magnum's revenue is primarily derived from the owners of towed vehicles, or from auctions of unclaimed vehicles, Magnum's primary business relationship is with vehicle owners themselves. Magnum, however, points to no evidence suggesting that defendants sought to disrupt Magnum's relationship with vehicle owners.

Moreover, while Magnum complains that Throne Towing and Captain Hennessy "bad mouth[ed]" Magnum, thereby frustrating Magnum's business relations with insurance companies and private businesses, Petrey Dep. 21-22, this complaint is unsubstantiated. Petrey never witnessed or overheard Throne talking with an insurance company, *id.* at 120-21, and she cannot remember or identify who told her that Captain Hennessy was "bad mouthing" Magnum. *Id*. at 21.

Magnum has offered no other evidence suggesting the City intentionally or improperly interfered with Magnum's business relations. As a result, the City is entitled to summary judgment on this claim.

**d. Breach of August 21, 2002 Settlement Agreement**

Magnum claims the City breached the August 21, 2002 settlement agreement when it initially allowed Magnum to operate out of the South Avenue location, later citing Magnum for violating its occupancy permit. Magnum also contends that the City targeted it for unfair treatment.

To establish a breach of contract claim Magnum must establish that: 1) a binding contract exists; 2) the nonbreaching party performed its contractual obligations; 3) the breaching party did not fulfill its contractual obligations without legal excuse; and 4) the nonbreaching party suffered damages as a result from the breach. *E.g., Lawrence v. Lorain County Community College*, 127 Ohio App.3d 546, 548-49 (1998).

Petrey claims that the defendants breached the following portion of the original settlement agreement:

> It is acknowledged that plaintiffs are currently operating their business at 515 Wamba Street in Toledo, Ohio, but intend to relocate to the 3400 South Avenue address upon construction of a building there. It is understood and agreed that provided such relocation occurs within the time periods prescribed by law for that construction, plaintiffs may continue to operate as a Class A Police Tower at 515 Wamba without regard to any need for a Special Use Permit at that location. It is further understood and agreed that no retaliatory actions shall be taken against Magnum Towing by the City or its Police Department with regard to its Class A status as a result of the institution of the lawsuit at issue here or its resolution.

Petrey Dep. at 136; Exhibit A.

While the agreement allows Magnum to operate at its Wamba Street location without a special use permit under certain conditions, the paragraph makes no such reference to the South Avenue location. Moreover, the settlement agreement does not obligate the City to disregard violations by Magnum of the City's occupancy permit rules.

Magnum also claims the City violated the settlement agreement by retaliating against Magnum for bringing the 1998 lawsuit. In support of this argument, Magnum refers generically to "evidence uncovered from the Building Departments file," but does not point to any specific evidence of retaliation. As a result, the City is entitled to summary judgment on Magnum's breach of contract claim.

**e. Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress, a plaintiff must show: 1) the actor intended to cause emotional distress, or knew or should have known that his or her actions would result in serious emotional distress; 2) the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency; 3) the actor's actions were the proximate cause of the plaintiff's psychic injury; and 4) the mental anguish suffered by plaintiff was serious and of such a nature that no reasonable person could be expected to endure it. *Walkosky v. Valley Memorials*, 146 Ohio App.3d 149, 152 (2001). Mere insults, indignities, threats, and annoyances cannot give rise to a claim for intentional infliction of emotional distress. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 375 (1983).

Magnum alleges that plaintiff Anna Petrey has suffered emotional distress as a result of defendants' extreme and outrageous conduct. Petrey complains that the City continually threatened to suspend Magnum from the towing list, revoke its license, and arrest Petrey for tax violations. Petrey Dep. 139-40. Petrey also claims she suffered emotional distress as a result of 1) the issuance of two bench warrants for the arrest of her sons, 2) other additional threats Petrey could not remember. *Id*. at 140-45. The effects of Petrey's emotional distress included sleeplessness, aggravation, migraine headaches, gray hair, and loss of appetite. *Id*. at 115-16.

Petrey's claim for intentional infliction of emotional distress fails for several reasons. First, Petrey cannot identify anyone from the City who triggered her distress. Moreover, Petrey has not provided evidence of a "severe and debilitating" injury. *See Paugh v. Hanks*, 6 Ohio St.3d 72, 78 (1983) (defining serious emotional stress as being both serious and debilitating and going beyond

upset or hurt feelings such that a reasonable person, or normal constitution, would be unable to cope with under the circumstances of the case).

**Conclusion**

For the foregoing reasons, it is hereby

ORDERED THAT:

1. Defendants' motion to strike be, and the same hereby is, denied; and

2. Defendants' motion for summary judgment be, and the same hereby is, granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge